May it please the Court, my name is Diane Valancourt, I represent Plaintiff Botello, and with me in the courtroom are Adriana and Joshua Botello. Trial of this First Amendment whistleblower case was anything but fair. It's our position that the lower court prejudged the matter, excluded an entire claim for relief without basis Was it a jury trial? It was a bench trial, Your Honor. Bench trial? Yes, that the court excluded an entire claim for relief with no basis to do so, and that it abused its discretion in evidentiary rulings, preventing Plaintiff Botello from putting on his case. This is a truant officer issue then? Your Honor, Mr. Botello started out as a detective with the Washoe County Sheriff's Department. The part that was left out? The part that was left out, yes, was the truant officer position. It was called, we call it SARB, School Advisory Review Board. Did the, was your client subjected to a request by the officials in this case that he be fired as a truancy officer? No, Your Honor. What happened was that the prosecutor issued a directive that our client could not make presentations to the SARB Review Board. This was an essential function of his job. Okay, but let's look at the practical effect here. Putting aside for a moment the veracity of the allegations, here you've got these public officials dealing with sex cases. The person who was the primary verifier, if you will, of the accuracy of those statements has been exposed by Mr. Botello as being reckless, false, et cetera, et cetera. Why would any prosecutor want to have someone who had accused perhaps a primary witness and undermined what they had been doing in this area on the stand dealing with a similar kind of an issue? Your Honor, with respect to this adverse action, Mr. Botello was a truancy officer. It had nothing to do with the court system, had nothing to do with investigations, had nothing to do with any prosecutions. He was just a truancy officer. But wasn't, doesn't this have to do with testifying about these very kinds of issues or is it something different? No, Your Honor, not at all. What it had to do was make presentations to a board. It was a non-judicial forum. And what were the nature of those board considerations? Did they have anything to do with possible sexual abuse or problems in homes or anything like that? Not at all, Your Honor. It was about truancy and absenteeism. That's it? That's it. Let's say, let's say that what's happening here is this DA is mad because Botello exposed the fact that the nurse practitioner that the DA's office was relying on for innumerable felony sex prosecutions was a total phony and incompetent. Let's assume that for purposes of discussion. And he was trying to get Botello any way he could. I'm unclear on how you get around the DA's immunities for not using Botello as a witness and for telling the other agencies that he wouldn't use Botello as a witness and he wouldn't listen to anything Botello said. Okay, Your Honor, that covers a lot of areas. I'll address it first. I was focusing on the DA's immunity. Okay, the DA's immunity is prosecutorial immunity. It's absolute immunity in the realm of criminal prosecution. Part of criminal prosecution is deciding what witnesses to call. He wants to call the nurse practitioner who can't even see a hymen. The three doctors say he's right there. And he doesn't want to call a former policeman who has pointed out that the nurse practitioner is incompetent. If that's what the DA wants to do, doesn't he have immunity for it? We have no problem with that, Your Honor, except in the truancy position, there was no possibility that Mr. Botello would be testifying in court. It was totally outside the realm of prosecutorial immunity. Mr. Gammack admitted that. Was this a truancy officer issue in the complaint? The district court seemed to say that it was never found in the complaint, therefore, you wouldn't want to take it in. Okay, what was in the complaint was a request for injunctive relief to prohibit the DA from continued retaliation against Mr. Botello. The truancy officer problem happened after the complaint. It happened after the case was first dismissed and then returned on, returned after the appeal. But so it was contemplated, continued interference with Mr. Botello's job was contemplated in the complaint. It was contemplated in a motion for preliminary injunction. It was specifically addressed in motions for summary judgment. The court addressed it in his order on summary judgment. And most importantly, it was in the JPO. The defendants had stipulated to that issue being an issue in the JPO. And under Rule 16, joint pretrial order, the judge signed an order where it was stipulated that the witness on behalf of the defense that would testify on this issue was going to testify. They had no objection. That's your basis for it. It went into the JPO, and there's no objection. And therefore, it should have been resolved by the court. Right, because the JPO has the effect of amending the pleadings, and it was signed by the court. And then at court, in trial, when plaintiff begins to submit, to set forth evidence on this issue, we're told, counsel, you know, the JPO is irrelevant. And that's contrary to Rule 16E and 999 versus CIT Corp. 776F2D866. It says the JPO has the effect of amending the pleadings. And also, this issue was addressed in discovery substantially. The prosecutor devoted 26 pages to talking about this issue, 26 pages. And he even did a formal admission on this issue, that he directed his assistant district attorney not to hear any of Mr. Botello's presentations. And the prosecutor admitted it had nothing to do with the realm of criminal prosecutions. The issue strikes me as a little bit different here. I think what he's claiming is his First Amendment retaliation claim is that his employer took adverse action against him. And at that point, the DA wasn't his employer. The truancy board, or whatever they call it, was his employer. That's another situation. And it's more akin to the Highland versus Wonder situation, where the district attorney used his power and influence to foreclose Mr. Botello's employer's staffing options. But he hired him. He was employed by the truancy board, was he not? Well, he was hired first as a school police officer. And then as a result of, and that's the second issue, the Billinghurst investigation, as a result of the pressure that the prosecutor put on Chief Myers, and we were not allowed to impeach the witnesses regarding what was said and what pressure was put to bear on them. I guess, Counsel, my point is simply that both with respect to the school police officer position and the truancy officer position, your client was actually employed by these people. It wasn't that the district attorney and the other parties called up these people and said, don't hire this guy. He was already hired, right? There was that allegation. We did not pursue that in this appeal. We're focusing this appeal on interference with an investigation where Mr. Botello was transferred to a desk job, and it was made clear to Mr. Botello's superiors that he could not work a desk job. He couldn't do grunt work. He couldn't be doubled with another officer. He couldn't even stand mutely by in an investigation, which resulted in his termination. Was that all pled? That was all in the, yes, it was all pled. It was part of Botello 1. That was not in the JPO, though, was it? Yes, all that was in the JPO. Plain pleading what you just said? Yes. It was in the first amended complaint. It was reiterated in the JPO. Did your client allegedly lose his job as the truant officer because Gammon called somebody and said don't mess with him or something like that? It's not that simple, Your Honor. He lost his job as a school police officer due to the pressure where he could not participate in any aspect, in any way, in any capacity, in any investigation, no matter when, no matter whether there was a prosecution in place. I understand the question was about truant officer. And then he was demoted to truancy officer. And the reason he was demoted there, Chief Meyers loved this employee, and Chief Meyers said, well, I want to keep you, so I'll give you this job where there's no chance that the prosecutor is going to intercede or put pressure on me because it has nothing to do with criminal prosecutions. And there, his ability to perform an essential function of that job, make these presentations, was hindered because he could not make these presentations whenever an assistant DA was present. He could not ---- Did the assistant DA have to be at those SARB meetings? The assistant DA attended two out of four of the SARB meetings. And also, Mr. Gammon issued a directive that Mr. Patella couldn't have any communications with anyone in his office. And another part of his job was to consult with members of Mr. Gammon's office as to what, you know, with legal parameters and handling truancy issues. Let me ask you this. I know you've stated that in a truancy situation there's no possibility of a criminal issue, but if there were, would not the district attorney's office have to turn over to defense counsel any information that might possibly be exculpatory, including, say, e-mails or communications from someone who had accused the DA's office of wrongdoing, malfeasance in office, et cetera? Wouldn't that be required under law? Well, turning things over to the defense counsel, I'd submit has nothing to do with the scope of the DA's immunity. Well, I guess my point is you have to ---- you've got three prongs you've got to show here. The last one is adverse action. And that's your troubling point, I'm afraid. And here my point is simply that the district attorney has certain interests that he needs to protect in his official role. He doesn't want to have to turn things over, makes his job more difficult and so on. And so he's just saying, hey, I've had a lot of trouble with this guy. He could cloud some of these investigations. I just don't want anything to do with him. You do whatever you want, the truancy office. But insofar as my office is concerned, I don't want anything to do with him. Does that constitute adverse action under our case law? When he puts pressure to bear on Mr. Botello's employer, so his essential job functions are ---- Was he fired as a result of that? Mr. Botello left the truancy job because he feared that he would again lose this job. Okay. So he ---- but this was his action. He was not fired because the sheriff or the district attorney says fire this guy, right? No, it was an adverse action because he couldn't perform his job and he knew he would be fired. It's a constructive firing or something like that. Pardon? Do you claim it's a constructive disjoint? No, I'm claiming it's an adverse action by interfering with the essential functions of his job. And I'd like to reserve the rest of my time. Thank you, counsel. May it please the Court, my name is Steve Balkenbush. I represent Assistant District Attorney John Helzer in this case, and with me today is Brian Brown, who's the attorney for the district attorney, Dick Gamak, and also Paul Anderson, who's the attorney for the county. Counsel? Yes, Your Honor. Let me tell you how it looks to me so you can educate me out of the way it looks to me. Certainly, Your Honor. It looks to me as though the nurse practitioner was frighteningly incompetent and dangerous. You've got three ---- she says there's no hymen there, this girl must have been sexually molested. Three different physicians say it's right there and it's obvious she was not penetrated. And she does this over and over again, and she's the one the DA's office is calling on all its sexual molestation cases of this nature. It looks like what happens is Patello blows the whistle on her, tells the FBI, and tells, oh, I can't remember the other person he told, Attorney General, thanks. And as a result, he's fired and blackballed, basically, and blackballed for everything, even things that have nothing to do with the DA's office, working for the DA's office or the sheriff that reports to the DA's office. I can't see why calling the truant board would have anything to do with prosecuting a case. There is no case there. They don't prosecute criminal cases. It looks like he's just being run out of the county because he blew the whistle on phony sex prosecutions. Your Honor, I could respond to those in order. Initially, Your Honor, I would have to respectfully disagree with the court that Nurse Clarkson was an incompetent nurse. There really is no evidence of that in this case. Yeah, there is evidence. There are three doctors who say she says I can't see a hymen, anybody else could. Your Honor, if I could explain. Your Honor, she examined one of these victims in November of 2001. That's what she did. She examined that victim and thought that victim had been sexually assaulted, and so noted. Four months later, in February of 2002, the same girl was examined by a physician who found that there was a hymen. It's not like healing a cut. Well, Your Honor, here's what happened as well. It's in the record. That Mr. Gamak counseled the nurse, and what she said is, I couldn't observe the hymen due to swelling. That's what happened. There was an alleged sexual assault. The nurse looked at this victim. The nurse also took colposcopic exams, photographs of the vagina at that time. And the doctor said they could see the hymen in the photos, as I recall. No, absolutely wrong, Your Honor. That's what's very interesting in this case. None of those photographs that were taken by Nurse Clarkson were ever provided to any of the other physicians in this case to review. So none of them had the photographs. Nobody provided the photographs to UC Davis. None. Absolutely not. Am I mixing up which photographs were provided to UC Davis? Yes, Your Honor, you are. Thanks. If you will just stick with me for a second here. So the nurse takes it, has the exam, takes these photographs. Then four months later, the kids are off to their pediatrician because they're complaining about their vaginas. That physician finds a hymen. Now, is the district attorney's office alerted to this? Are they made aware of this by Mr. Patel? Absolutely not. Nothing happened. Then the parents bring him down because his physician, Dr. Windisch, says let's go ahead and have him examined. The parents say let's have him examined at a forensic hospital, Oakland Children's Hospital, to see if there's anything wrong with them. So they go over there in May, in May of 2000. Now we're seven months beyond the exam done by the nurse, and they find that the girls have a hymen as well. But none of those doctors ever saw what Nurse Clarkson saw, the vagina, which was swollen, which made it difficult to observe the hymen. That's what's missing here, Judge. Then what's she saying there was no hymen for? She couldn't see one way or the other. Your Honor, she was counseled by the district attorney that it would have been better and more appropriate to say that you could not observe the hymen due to swelling, instead of saying absent hymen. No kidding. Otherwise you convict innocent men. Not necessarily, Your Honor. That is a piece of evidence in the case, and that evidence could be reviewed by experts, the colposcopic examinations, and experts could testify on that. In this case, it didn't happen because that matter never went to trial. But this lady's been vilified and crucified, and yet there's not a single physician in this case that ever reviewed what she did. Now, sure, they saw the kids four months and seven or eight months later. You're not going to have necessarily the swelling. You're not going to have any earmarks of any type of penetration. That's what happened. And then, Your Honor. But losing your hymen is more like cutting off your finger than getting a sore throat. It doesn't get fine four months later. Well, Your Honor, I appreciate that. But what I'm saying is that her explanation was that the swelling of the tissue in the vaginal area made it difficult for her to observe the hymen. That's what she did. Which is not what she said in her report. That's correct. That's what she did. That's what she, when she talked to the district attorney about it, that was what was stated. And, Your Honor, bottom line is. I mean, she said something totally different in her report, no hymen. And then when she's asked to explain away and excuse, give some kind of excuse for being wrong, she says, well, it was swollen. I couldn't see that well. Well, Your Honor, I don't know if it was an excuse. It was a further explanation when she was being asked by the district attorney what happened. And he gave and she gave that explanation as to what happened concerning that examination. And this fellow exposed it all. Now, what justification does the DA have and what immunity does he have when he calls the truancy board and says, I won't listen to anything that this guy touches? Your Honor, that's not what happened either. What happened in this case with respect to the truancy issue, and as I stand here today, I still don't understand what that issue is because it was never pled by the plaintiffs. Well, it's in the pretrial order. And a pretrial order functions as a pleading. Well, Your Honor, I disagree with that as well. This is – I've been doing this for 30 years. And Your Honor, let me just explain. This pretrial order, because it was so contentious, they alleged what they believed should be issues tried in the case. And we allege what we believe to be the issues of the case. Your Honor, in our – it was absolutely not in our statement of the issues to be tried in the case. The only issues to be tried in the case that we stated in the pretrial order was whether or not we coerced, that is, Mr. Helzer or Mr. Gammon coerced, the Washoe County School District Police Department to take an adverse employment action in this case. That's it. That's the only issue we – Your Honor, we fought the truancy issue. The defendant doesn't get to control the case. The judge controls the case. The parties state what the issues are in the pretrial order. That's – Your Honor, generally, and every other pretrial order that's ever been entered in a case that I have tried, it is a joint pretrial order where the parties agree as to the issues to be tried. In this case, it was so contentious, they went off and alleged what they wanted to allege, and we alleged what we believed was an issue because those issues were clearly stated by this court in Botella v. Gammon on remand. So there really wasn't a joint pretrial order. That's correct, Your Honor. There really wasn't. It was the most contentious pretrial order experience I've had in my entire life. What was it? Pardon me, Your Honor? What was it if it wasn't a joint pretrial order? Well, Your Honor, it was a pretrial order that was the U.S. Magistrate ordered their issues be stated by them and that our issues be stated by us because we were never going to be able to come to an accord on it. U.S. Magistrate, I've never had this happen before, where she stood over that entire pretrial order and tried to march it through so they would have a pretrial order available for the district court judge in this case. That's what happened. I don't see anything extraordinary about that. I mean, Rule 16 provides for pretrial orders. Sometimes the parties don't agree. You may not have seen it. I've seen it. Parties sometimes agree, sometimes they don't. It says joint pretrial order on the first page, and then at the end of it, it has the signatures. Counsel. That's correct, Your Honor. I just gave you an explanation as to what happened. That's why all the issues are stated differently by one party and another party. We never consented to that issue. By executing that pretrial order, we made it very clear to the court. The court was aware of that. Let's assume, just arguendo, I'm not saying I agree with the plaintiffs on this, but assume for our discussion only that there was an adequate pleading to bring the issue up. I'm still confused about where the adverse action was with respect to the truancy position. Your Honor. They have the third prong they've got approved. That's right. I'm having difficulty seeing the adverse action. One of the things that your opposing counsel indicated was that in the truancy position, that there was really nothing having to do with your respective client's jobs, if you will, that ever came up. It was just totally out there. There would be no reason for there to be any concern on the part of, say, the district attorney. Is that accurate? Your Honor, that's not entirely accurate. What happened, your Honor, is the district attorney's office was informed that he would not be used as a witness in criminal prosecutions. All the members of the district attorney's office. I understand that. But let's get to the truancy issue. And then, as a result of that, this deputy DA who sat as a member of the board came to the district attorney. Her name was Sue Edmondson. She came to the district attorney and said, he makes presentations to this board, and here's what I propose. It was her proposal. It wasn't the district attorney's proposal. She said, here's my proposal. When he makes presentations, I simply will not sit on the board for those presentations. Was she a member of the board? Pardon me, your Honor? Was she a member of the board? She was a city member. There was a seat for a member of the district attorney's office on the board. She did not need to sit on each and every one of them, nor did the district attorney's office need to be seated for that board. She just was one of the members. How many members were there? I think there were seven, your Honor. Seven. So if she leaves, there's no problem. That's right. And that, your Honor, was the accommodation that was reached. When he makes his presentations, then we simply won't sit. There was never one instance where he was refused the opportunity to make a presentation in this case to the SAR board ever. There was no interference. So that ‑‑ I'm sorry. Go ahead, Judge. I was just going to say, was all this before the court? The court didn't hear any of this. Your Honor, it's ‑‑ It's about depositions. That's correct. And you have that information before you, Judge, in this case. You know the record. By virtue of the depositions, they've added that information. And so that is ‑‑ you have that information. The court did not allow that to be tried for the simple reason that it wasn't pled. And let me say this, your Honor. When they pled this case, what they did is they pled three things. Three things that were done by the DA to the Washoe County School District Police. And that we tried to get him not hired, tried to get him fired. We called him and said, hey, don't hire this guy. Hey, go ahead and fire this guy. And we told him how to be used as a witness or how he should be used as an investigator. Everybody that testified in this case to a person that would be the chief of police as well as the assistant chief of police said all we ever told them is we would not use them as a witness in criminal prosecutions. We didn't tell them any more, any less. That's exactly what we told them. And for someone to come into this courtroom and argue otherwise, that's the uncontroverted evidence. That's what the district court found. We said ‑‑ and they were all asked, well, did he tell you to not hire him? Did he tell you to fire him? Did he tell you how to use him as a witness in a case? The answer was absolutely not. Yes, your Honor. Can I get back to the truancy issue again? What you mentioned a minute ago is an important piece of evidence I was not aware of that was in the record. So you're saying that the truancy board, there's seven people on the board. If I understand what you're saying, the record would indicate that the district attorney and sheriff, nobody else said. He may not testify. All that happened was that his agent, Edmondson, as part of a protocol just said when he gets up there, I'm going to leave. But there are six other people who remain. Is that what happened? That's absolutely correct, your Honor. Do you have any citation to the record? Your Honor, that's ER 693. That's ER 693. That was deposition testimony of Mr. Gamet. And that's precisely what he said, that his deputy DA came to him, said this is the issue. He says, and she made the proposal. And he said, fine. That will be fine. Notified. And that's what happened. And we went forward. And nothing, no adverse employment actions. So if, again, assuming that Ms. Edmondson never, ever, ever heard him, he could continue to make presentations. The SAR board could continue to operate with impunity, with no problem. Absolutely, your Honor. That is absolutely the truth. And one final thing I would like to say as my time is running out. The Delgado case and the Hyman case had nothing to do with the district attorney's position in not using him as a witness in criminal prosecution. There was a whole other case called Reyes-Chavez. His performance in that case as an investigator was despicable. The district attorney determined that from reviewing the preliminary hearing transcript in the case, the police reports in the case, and also the interview transcripts of Mr. Botello, and said that the stuff that he did was over the top, using child pornography in those things, talking about attributing acts in playing with a person's vagina to someone else, competency issues were not done properly, using the Virgin Mary to evoke the confession. But those went to the initial firing, and I gather they're not appealing that. Is that correct? Well, your Honor, I'm not exactly sure what they're appealing, but the bottom line is the Reyes-Chavez case caused district attorney Gammack to make the decision not to use him as a witness. Some of that I'm not so sure about. I mean, saying it's despicable when he's fired is one thing, but, boy, police just routinely lie and appeal to people's religious feelings and all that in order to get confessions. It's just standard police conduct. Not in Washoe County, your Honor. The sheriff testified in this case that that violated the rules of the office, and so did his supervisor, that they violated the rules of the office in using child pornography. And never was child pornography ever used by Mr. Botello prior to this time in this case. Is that like one of those anatomic? I don't know what child pornography means here. I know that in sex prosecutions, ordinarily somebody shows the children anatomically correct dolls or pictures in order to have them identify where the person touched or what he exposed or whatever. I don't know what happened there. Your Honor, these are graphic pictures of adults and children in compromised positions, and it wasn't shown to the kids. It was shown to the suspect in the case. But the district attorney said, I'm not dealing with this. He's violating Miranda. We're not going to deal with this type of a witness ever in this office. Boom. Made that decision August 15th. Any speech in this case that they claim that they allege was protected occurred after that decision absolutely ends the hunt in a First Amendment case. There is no causation. There is no adverse employment action. That's what happened. He did these vile acts in Reyes Chavez. In that case, they're all articulated in our brief. And after he did that, the decision was made not to use him as a witness, and he drove somewhere down the road to the AG's office and the FBI. That did not occur until after the decision was made not to use him. There is no causal connection. There is no substantial or motivating fact that they can prove in this case. There is no First Amendment claim that's colorable. Thank you. Thank you, counsel. Thank you, counsel. Your Honor, the testimony will be that Mr. Patella had to have other truancy officers make presentations on his behalf. Well, let me be clear on something. Your opposing counsel has indicated that ER-693 will show that there were seven members of the board that when your client made a presentation, that Ms. Edmondson would leave the room. Is that accurate from your perspective? No, Your Honor. And where in the record would we find something to the contrary? I cannot cite to that right here. I ask permission to send that citation afterwards. Yeah, send a 48-day letter if you've got that. So other than her leaving the room, was there any communication that was directed to the truancy board or anybody else saying that he could not testify in these commission hearings? The communication was he could not make any presentations before, while any assistant DA was present. Well, but I think what happened was that she was going to leave. Well, there were, in fact, situations where that didn't happen, and he was forced to prepare other truancy officers. By whom? Because the assistant DA was, in fact, present, and he was not able to give his presentation. But that was the decision to go forward or not go forward on his part. Was that made based upon whether the DA's assistant was there or not there or something else? It was made based on whether the DA's assistant was sitting on the board. Okay. If she's sitting on the board, that's her choice, right? She was on the board. Did she say, if he gets up, Mr. Motello, I'm not going to listen to anything you have to say? He did not. He was precluded from making presentations there by District Attorney Gammack. No, but that's not what we understood had happened here. If you have a citation of the record, I'll be anxious to see that. But what I'm understanding is, and there seems to be a different view, what we understood from opposing counsel was that Sue Edmondson, and there was a protocol that if your client was making a presentation, she would leave. You say it's different. What I'm asking for is the citation in the record that will tell us who from the District Attorney or the Sheriff's Office communicated to either some official on the truancy board or to whoever controlled it that he could not make any presentation to what they call the SAR board. Is that right? Correct. Can you give us a citation to the record on that? Okay. We will follow up. I have a question, too. Yes. In the pretrial order, what I found about the truancy board was that ER30, even after Botelho's role was reduced to truancy officer, Gammack continued to sabotage Botelho's employment. He issued restrictions on how Botelho could perform his truancy position and interfered in other ways, causing Botelho extreme emotional distress and humiliation. Is there more that I have not found in the pretrial order, or is that it? That's it. One of the other directives was that Mr. Botelho could not communicate with any assistant DAs, which was also an essential part of his truancy job. Who is the boss at the truancy board? I don't know what the hierarchy is. I don't have the answer to that, Your Honor. Did he work for the police department? No, he was still working for the police department. He was fired by Chief Myrus of the police department and immediately rehired in the truancy officer to avoid problems with the DA. I don't think you understood my question. Okay. You tell me somebody is a truancy officer, it's kind of like telling me somebody is a federal police officer, and I don't know if he works for the Park Service or the FBI or the DEA or what. And I know that they could hate him at the DEA and still like him at the FBI or vice versa. I want to know what the bureaucratic structure is here. Who is the truancy board? Are they part of the education department, the county department of education? What? I believe it was a group consisting of the school police and the district attorney's office and educational board. Who pays them? What agency? Well, Mr. Patella was paid by the school police. I'm trying to find out what agency writes his paycheck when he's working for the truancy board. The school police. That's part of the school board. Oh, it's one of his jobs as a truancy officer. No, no, you're getting away from it again. He works for the school board at this point? No, he works for the Washoe County School Police Department. And the Washoe County School Police Department, whose jurisdiction are they under? They are part of the Washoe County school system, yes. It's not a separate sheriff's office or anything like that. It's a subdivision under the school board. That's correct. That's my understanding. Okay, and they never fired him, but he eventually left because his job was not working out. Yes, he left because he could not do his job, because he could not. Okay, now I get it. But you're not saying that he's not claiming he was constructively fired. His job functions were interfered with. I understand that, but I'm just saying, are you claiming, do your pleadings claim, that he was constructively fired from the truancy position? I think if he can't do his job, yes, he's constructively fired. He wrote his police chief saying. Is this something that's happening now, or is it something you pled earlier? It was an adverse action that he was unable to perform essential job functions connected with the SAR board. If opposing counsel is correct, and I'm not saying whether he is or not, but if he's correct in his citation to the record, and you've got six people on that board, and if Ms. Anderson or whatever her name is left and he makes the presentation to the board, they can function perfectly well with six people, why would that interfere with his job? I mean, it may be uncomfortable, but you do his job, right? He did not feel he could. The reality was that he wasn't able to. He had to have another truancy officer make his presentation when she was on the board. What they did was they would say, well, you can make your presentation this time, but you can't make it the next meeting. Well, the problem is that the next meeting when this ---- But nobody told him we have to let you go. He was not told he had to be let go, but he was just let go as a school police officer because he wasn't allowed even to ---- Right. I understood that. I was asking truancy officer. No, he left that job because he didn't feel he could do his job. Thank you, counsel. Your Honor, if I can just note for the record that the School District Advisory Board is a school district board. Thank you. It's formed under that, and the other citation of the record, Your Honor, is ER-59. Counsel, just a minute in writing.  All right, thank you. Thank you. And Petillo v. Spamek is submitted. We'll hear United States v. Socosta.
judges: Kleinfeld, Smith M., Siler